**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PETER CHAPLA | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | CASE NO.: 22-3971 |
| v. | : | |
| | : | |
| FATHER JUDGE HIGH SCHOOL | : | |
| and | : | |
| THE ARCHDIOCESE OF PHILADELPHIIA | : | |
| D/B/A ARCHDIOCESE OF PHILADELPHIA | : | |
| SCHOOLS (SECONDARY SCHOOLS) | : | |
| and | : | |
| THE OFFICE OF CATHOLIC EDUCATION | : | |
| | : | |
| Defendants. | : | |

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56**

---

Of Counsel and on the Brief:
    Eileen Keefe, Esq.
    Sophia Czerniecki, Esq.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................ ii

STATEMENT OF FACTS ..........................................................................................1

PROCEDURAL HISTORY ........................................................................................1

LEGAL ARGUMENT ................................................................................................2

INTRODUCTORY STATEMENT .............................................................................2

POINT I--SUMMARY JUDGMENT IS APPROPRIATE BECAUSE THERE ARE NO
      GENUINE ISSUES OF MATERIAL FACT AS TO THE APPLICATION OF THE
      MINISTERIAL EXCEPTION TO BAR PLAINTIFF'S CLAIMS..............................4

POINT II--CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFF HELD AND
      PERFORMED MINISTERIAL FUNCTIONS AS LAY PRINCIPAL .....................5

    A.  As Fr. Judge Principal, Mr. Chapla Held and Performed Ministerial Duties. ....................5

        i.     The AOP, OCE and Fr. Judge have religious missions and objectives. .................9

        ii.    Mr. Chapla's articulated job requirements address ministerial obligations...........15

        iii.   Faculty and student handbooks affirm Roman Catholic priorities .......................18

        iv.   Mr. Chapla had ultimate authority and oversight over religious teaching.............19

        v.     Mr. Chapla had ultimate responsibility for faith formation, ie. Catechesis...........20

        vi.   Mr. Chapla led and participated in prayer, masses, retreats and events. ..............22

        vii.  Mr. Chapla provided visible, recognized ministerial leadership at Fr. Judge........26

    B.  The Ministerial Exception Applies to Lay Employees Who Delegate Ministerial
       Tasks ........................................................................................................29

CONCLUSION..........................................................................................................32

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*" Orr v. Christian Bros. High Sch.,*
  No. 21-15109, 2021 U.S. App. LEXIS 34810 (9th Cir. Nov. 23, 2021) ...............................30

*" Skrzypczak v. Roman Cath. Diocese of Tulsa,*
  611 F3d 1238 (10th Cir. 2010) .................................................................................9, 10, 12

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)........................................................................................................4, 5

*Atkinson v. Lafayette Coll.,*
  460 F.3d 447 (3d Cir. 2006)................................................................................................6

*Braun v. St. Pius X Par.,*
  827 F. Supp. 2d 1312 (N.D. Okla. 2011) ..........................................................................29

*Butler v. St. Stanislaus Kostka Catholic Acad.,*
  609 F. Supp. 3d 184 ...........................................................................................7, 18, 19

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)............................................................................................................5

*Dayner v. Archdiocese of Hartford,*
  23 A.3d 1192 (Conn. 2011) ..............................................................................................31

*Fitzgerald v. Roncalli High Sch., Inc.*
  73 F. 4th 529 (7th Cir. 2023) ...................................................................................9, 28, 29

*Fratello v. Archdiocese of N.Y.,*
  863 F.3d 190 (2d Cir. 2017)................................................................................2, 19, 28, 29, 30

*Fratello v. Roman Cath. Archdiocese of New York,*
  175 F. Supp. 3d 152 (S.D.N.Y. 2016), *aff'd sub nom. Fratello v. Archdiocese*
  *of New York,* 863 F. 3d 190 (2d Cir. 2017).........................................................................6

*Ginalski v. Diocese of Gary,*
  2016 U.S. Dist. LEXIS 168014 (N.D. Ind. Dec. 5, 2016) ....................................................30

*Hewitt v. BS Transp. of Ill., LLC,*
  2019 U.S. Dist. LEXIS 6407 ..............................................................................................6

*Hosanna-Tabor Evangelical Lutheran Church & Sch. V. EEOC,*
  565 U.S. 171 (2012)...................................................................................2, 3, 6, 30

ii

*Hozier v. Midwest Fasteners, Inc.*,
  908 F.2d 1155 (3d Cir. 1990)..........................................................................4

*in Synthes, Inc. v. Emerge Med., Inc.*,
  25 F. Supp. 3d 617 (E.D. Pa. 2014) ..............................................................5

*Kline v. First W. Gov't Sec.*,
  24 F.3d 480 (3d Cir. 1994)........................................................................5, 11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)........................................................................................5

*Nolen v. Diocese of Birmingham in Ala.*,
  2017 U.S. Dist. LEXIS 141496 (N.D. Ala. Sep. 1, 2017, No. 5:16-cv-00238)......................30

*Our Lady of Guadalupe Sch. V. Morrissey-Berru*,
  140 S. Ct. 2049 (2020).....................................2, 3, 6, 7, 8, 9, 15, 18, 19, 20, 22, 25, 26, 29, 30

*Pardue v. Ctr. City Consortium Schs. of Archdiocese of Wash.*,
  875 A.2d 669 (D.C. 2005) ............................................................................31

*Petruska v. Gannon Univ.*,
  462 F.3d 294 (3d Cir. 2006).........................................................................29

*Sabatino v. St. Aloysius Par.*,
  672 A.2d 217 (N.J. Super. Ct. App. Div. 1996)............................................31

*Simon v. Saint Dominic Acad.*,
  Civil Action No. 19-cv-21271, 2021 U.S. Dist. LEXIS 247351 (D.N.J. Dec.
  29, 2021) .......................................................................................................15

*Starkey v. Roman Catholic Archdiocese of Indianapolis*,
  496 F. Supp. 3d 1195 (S.D. Ind. 2020).........................................................18

*Temple Emanuel of Newotwn v. Mass. Comm'n Against Discrim.*,
  975 N.E.2d 433 (Mass. 2021) ......................................................................29

*Zaleuke v. Archdiocese of St. Louis*,
  4:19-CV-2856 PLC, 2021 U.S. Dist. LEXIS 214496 (E.D. Mo. Nov. 5, 2021) ....8, 19, 26, 27,
  28, 29, 30

## Statutes

Age Discrimination in Employment Act ........................................................1

Americans with Disabilities Act, 42 U.S.C. § 12101 ...................................1

Family Medical Leave Act of 1993, 29 U.S.C. § 2601-2654 (2006) .............1

Pennsylvania Human Relations Act.................................................................................6

Pennsylvania Human Relations Act, 43 P.S. § 962(a)....................................................1

**Other Authorities**

Federal Rules of Civil Procedure Rule 56 ..............................................................4, 32

U.S. Const. amend. I. .............................................................................................6, 7

## STATEMENT OF FACTS

The undisputed material facts showing that Defendants are entitled to summary judgment are set forth in numbered paragraphs in Defendants' Statement of Undisputed Facts ("SUF"), incorporated herein.

## PROCEDURAL HISTORY

Plaintiff Peter Chapla ("Mr. Chapla"), the former principal of Fr. Judge, filed the instant employment discrimination action in the U.S. District Court for the Eastern District of Pennsylvania on or about October 6, 2022. *See* ECF Doc. 1; Amended at 18. He alleges that Defendants illegally terminated him from his position as principal following the 2021-2022 school term, in violation of the Family Medical Leave Act of 1993 ("FMLA"), the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act, ("ADA), and Pennsylvania Human Relations Act ("PHRA"). *Id.* On December 27, 2022, Defendants filed a timely Answer and Defenses, including the ministerial exception defense because it preclude his employment discrimination claims. *See* ECF Doc 2; 19. Thereafter, Defendants requested that This Court enable the parties to engage in limited, focused discovery relating to the ministerial functions of the Fr. Judge principal to enable the parties and This Court to evaluate whether the ministerial exception applies to preclude all of Mr. Chapla's claims as a matter of law. *See* ECF Doc. 8. Plaintiff opposed the motion, and included a Declaration in which he denied having or performing ministerial functions. ECF Doc. 9, Ex. A. The Court, on or about August 29, 2023, granted the motion and the parties conducted limited, tailored discovery relative to the alleged ministerial job duties and functions. ECF Doc. 20. Defendants now file the instant Motion for Summary Judgment, seeking dismissal because, based on application of law to the undisputed record

evidence, the "ministerial exception" applies to preclude all of Plaintiffs' claims against all Defendants.

## **LEGAL ARGUMENT**

## **INTRODUCTORY STATEMENT**

The United States Supreme Court has recognized that "[t]he religious education and formation of students is the very reason for the existence of most private religious schools, and therefore the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission." *Our Lady of Guadalupe Sch. V. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020); *see also Hosanna-Tabor Evangelical Lutheran Church & Sch. V. EEOC*, 565 U.S. 171 (2012). The undisputed record, including multiple concessions from Mr. Chapla directly, demonstrate the unmistakable importance of both principals and teachers to the religious mission of the OCE, AOP, and Father Judge.

Indeed, the undisputed facts resolve any question as to whether Mr. Chapla is subject to the ministerial exception considering his expected and performed job functions, regardless of his title as "lay principal" rather than clergy. *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 210 (2d Cir. 2017) ("In sum, then, we conclude that although [the plaintiff's] formal title [of lay principal] was not inherently religious, the record makes clear that she held herself out as a spiritual leader of the School and performed many important religious functions to advance its Roman Catholic mission.")

Like the present case, the Supreme Court in both *Hosanna-Tabor* and *Our Lady of Guadalupe* decided the cases after the parties engaged in discovery and on motions for summary judgement based on evidence showing the plaintiffs' roles at their respective employer's schools. *Hosanna-Tabor*, 565 U.S. at 180-81; *Our Lady of Guadalupe*, 140 S. Ct. at 2052. Here, all parties

have engaged in tailored discovery, and as presented in the statement of undisputed facts (SUF). The record supports the conclusion that Mr. Chapla played a specific, visible role in fostering and promoting faith formation as Fr. Judge Principal. Therefore, all of Mr. Chapla's claims are barred by the ministerial exception and summary judgment is proper as a matter of law.

As addressed further herein, Mr. Chapla himself concedes that Fr. Judge hired him as principal not simply to promote a positive message but, specifically, to promote the virtues and values of its patron saint, St. Francis de Sales. SUF at 49. Mr. Chapla understood that promoting the Roman Catholic faith, Salesian spirituality, and principles of Catholic education constituted essential functions of his job. SUF at 49, 71. This point best was evidenced when, at the onset of the role, Mr. Chapla stood before the entire Fr. Judge community of Oblate priests, administrators, faculty, students, and guests, during an Induction mass and "pledged" to "*lead, guide and administer [Fr. Judge] with the authority given...by the Office of Catholic Education and the moral authority handed down by the Oblates of St. Francis De Sales*." SUF at 59. At the same ceremony, he made a "*promise to seek always the intercession of St. Francis de Sales and the prayers of this community to conduct [himself] as the Principal of Father Judge High School in a manner most pleasing to God*.," and closed the statement to the congregation by saying **"[m]ay God be blessed."** *Id.*

Per the governing standards and guidance set forth by the Supreme Court of the United States in *Our Lady of Guadalupe*, This Court's analysis could reasonably start and end with that pledge and prayer by Mr. Chapla. Indeed, this portion of the record alone forecloses reasonable dispute about Mr. Chapla's understanding and ultimate expectation that the principal position at Fr. Judge classified as "ministerial" as well as administrative. *See* SUF at 53-62. Looking beyond the pledge made when he was inducted to the position, however, the undisputed record when evaluated in conjunction with *Our Lady of Guadalupe*, *Hosanna-Tabor*, and other federal and state caselaw compels dismissal by application of the ministerial

3

exception. As addressed herein, all competent, undisputed record evidence discussed herein confirms that Defendants had established, documented, and enforced priorities for Catholic education, and maintained requirements for AOP principals to perform ministerial functions even if labelled, accurately, as lay principals rather than clergy. *See* SUF at 4-30; 40-51. Moreover, the competent, undisputed record evidence confirms that Mr. Chapla regularly fulfilled expected ministerial functions such as leading prayers with the school community, emailing or otherwise delivering Salesian/Roman Catholic prayers or messages, participating in school masses and retreats, engaging in mandatory spiritual retreats sponsored by the OCE, overseeing the campus ministry department and evaluating its efficacy, proposing methods to integrate the teachings of St. Francis de Sales into the school, adopting and regularly using Salesian specific language, and embracing the school's ethos to create not only a generation of high school graduates but, as the handbook promises, "Salesian Gentlemen."

### POINT I

### SUMMARY JUDGMENT IS APPROPRIATE BECAUSE THERE ARE NO GENUINE ISSUES OF MATERIAL FACT AS TO THE APPLICATION OF THE MINISTERIAL EXCEPTION TO BAR PLAINTIFF'S CLAIMS

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court **shall** grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (emphasis added). A factual dispute is "material" if its resolution could affect the outcome of the case under the applicable substantive law, and is "genuine" if the evidence bearing on the disputed fact could lead a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1158 (3d Cir. 1990). The Supreme Court has definitively stated that "[s]ummary judgment procedure is properly regarded **not** as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which

are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (emphasis added), *quoting* Fed. R. Civ. P. 1.

A party may demonstrate an entitlement to summary judgment by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once that showing is made, the burden then shifts to the opposing party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "'[A] motion for summary judgment must be granted unless the party opposing the motion can produce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor.'" *Kline v. First W. Gov't Sec.,* 24 F.3d 480, 485 (3d Cir. 1994), *quoting J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir. 1987) (Becker, J., concurring)*; see also Anderson*, 477 U.S. at 249-50 (the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue), *cited in Synthes, Inc. v. Emerge Med., Inc.,* 25 F. Supp. 3d 617, 672 (E.D. Pa. 2014).

Applying these principles leads to the inescapable conclusion that Defendants are entitled to summary judgment.

## POINT II

## CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFF HELD AND PERFORMED MINISTERIAL FUNCTIONS AS LAY PRINCIPAL

**A. As Fr. Judge Principal, Mr. Chapla Held and Performed Ministerial Duties.**

5

The First Amendment protects the right of religious institutions, like Father Judge High School[1] to "decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Our Lady of Guadalupe* 140 S. Ct. at 2055 (*quoting Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N.Am*., 344 U.S. 94, 166 (1952)). From the religious clauses of the First Amendment, the Supreme Court formally recognized the ministerial exception, "which ensures that the authority to select and control who will minister to the faithful – a matter strictly ecclesiastical – is the church's alone." *Hosanna-Tabor*, 565 U.S. at 194.[2] The exception provides that, "courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Our Lady of Guadalupe*, 140 S. Ct. at 2060.[3] [4] While the first Supreme Court application of the exception applied to a religious education teacher ("minister of religion"), the Court has determined the exception is not limited to those with a formal ministerial title but extends to those who educate students in the faith because of its "vital religious duty." *Our Lady of Guadalupe*, 140 S. Ct. at 2060, 2066. Of note, the plaintiff-teachers in *Our Lady of Guadalupe* were deemed ministerial even where the record reflected that neither held the position of priest or minister, neither had specialized training, one would not lead her class in prayer, and one did not even practice the

---

[1] It cannot be disputed that Defendants are "religious institutions" to which the ministerial exception may apply. *Fratello v. Roman Cath. Archdiocese of New York*, 175 F. Supp. 3d 152, 165 (S.D.N.Y. 2016), *aff'd sub nom. Fratello v. Archdiocese of New York*, 863 F. 3d 190 (2d Cir. 2017) ("As a preliminary matter, parochial schools are considered 'religious organizations' for purposes of the ministerial exception."); *see also* SUF at at ¶¶ 2-39.

[2] Holding a fourth grade teacher at a Lutheran school to be a minister, citing in part the use of her title, the process behind her hiring and the "important religious functions she performed." *Hosanna-Tabor* at 191-92.

[3] Defendants maintain that their decision to terminate Mr. Chapla had nothing to do with his alleged membership in any protected class, but note that the ministerial exception bars inquiry into the underlying reasons behind a religious employers employment decision. Like the plaintiff in *Hosanna-Tabor*, Mr. Chapla claims his termination was pretextual and retaliatory, but the Supreme Court has unequivocally held that a court was precluded altogether from inquiring into the given justification for the termination, whether it be religious, pretextual, or otherwise. *Hosanna-Tabor,* 565 U.S. at 194; *Our Lady of Guadalupe,* 140 S. Ct. at 2072.

[4] By logical extension, the application extends to the Pennsylvania Human Relations Act as a matter of law. *See Atkinson v. Lafayette Coll.*, 460 F.3d 447, 454 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with [federal claims]"); *Hewitt v. BS Transp. of Ill., LLC*, 2019 U.S. Dist. LEXIS 6407, at *18 (same).

Roman Catholic faith although teaching at a Catholic parochial school. 140 S. Ct. at 2056, 2058, 2078, 2079.

Per the Court, "when a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does now allow." *Our Lady of Guadalupe*, 140 S. Ct. at 2069. The Supreme Court further recognized that a religious school maintains full authority to make decisions about who will educate students in the faith:

> When a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow.

*Id.* at 2069.

In determining whether one is a minister within the meaning of the ministerial exception, the Supreme Court declined to adopt a "rigid formula" and instead has "called on courts to take all relevant circumstances into account to determine whether each particular position implicated the fundamental purpose of the exception." *Our Lady of Guadalupe*, 140 S. Ct. at 2067. Additionally, the Supreme Court noted that, "what matters, at bottom, is what the employee does." *Our Lady of Guadalupe*, 140 S. Ct. at 2064. The Supreme Court expressed the importance of "afford[ing] meaningful deference to religious school administrators and clergy when they attest that a particular employee had ministerial duties."[5]

---

[5] In *Our Lady of Guadalupe*, the court noted that both teachers' "schools saw them as playing a vital role in carrying out the mission of the church, and the schools' definition and explanation of their roles is important. The reasoning behind this deference is: "in a country with the religious diversity of the United States, judges cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition. *Butler v. St. Stanislaus Kostka Catholic Acad.*, 609 F. Supp. 3d 184, 197 citing to *Our Lady of Guadalupe*, 140 S. Ct. at 2066.

While no one factor is dispositive of one's ministerial status under the exemption, the Supreme Court in *Our Lady of Guadalupe* found the following factors to be important: **(1) the schools' stated missions**, *Our Lady of Guadalupe*, 140 S. Ct. at 2066. ("educating and forming student in the Catholic faith lay at the core of the schools where they taught"); **(2) the teachers employment agreements**, *Our Lady of Guadalupe*, 140 S. Ct. at 2056, 2066 ("duties and responsibilities as a Teacher were to be performed within the [Catholic School Faith Community] overriding commitment," expectations to "model and promote Catholic faith and values," and "guide their students, by word and deed, toward the goal of living their lives in accordance with the faith"); **(3) faculty handbooks**, *Our Lady of Guadalupe*, 140 S. Ct. at 2058-59 ("religious development as the school's first goal and provide[d] that teachers must 'model the faith life,' 'exemplify the teachers of Jesus Christ,' 'integrate Catholic thought and principles into secular subjects,' and 'prepare students to receive the sacraments'"); **(4) religious teachings**, *Our Lady of Guadalupe*, 140 S. Ct. at 2057 ("under the prescribed curriculum. [teachers] were expected to teach students, among other things, to learn and express belief that Jesus is the son of God and the Word made flesh; to identify the ways the church carries on the mission of Jesus"); **(5) "catechist" status**, *Id.* ("Catechists are 'responsible for the faith formation of the students in their charge each day'"); and **(6) participation in prayer**, *Our Lady of Guadalupe*, 140 S. Ct. at 2056-7, 2059 ("one teacher… was 'expected to attend faculty prayer services' and was required to participate in 'school liturgical activities, as requested.'" and "occasionally selecting and prepared students to read at mass").

Since *Our Lady of Guadalupe*, other courts have looked to the **"important religious functions"** the individuals performed and whether they were a **"key, visible leader"** of the school and frequently concluded that their claims were precluded by law. *See Zaleuke v. Archdiocese of*

*St. Louis*, 4:19-CV-2856 PLC, 2021 U.S. Dist. LEXIS 214496 (E.D. Mo. Nov. 5, 2021) (dismissing a principal's claims on summary judgment because he was a "minister" under the exception because of his "important religious functions"); *Fitzgerald v. Roncalli High Sch., Inc*. 73 F. 4th 529 (7th Cir. 2023) (holding district court properly granted summary judgment because a guidance counselor was a "minister" under the exception because she was a "key, visible leader.") Even prior to the *Our Lady of Guadalupe* ruling, courts have recognized that the ministerial exception applies "to ***any employee*** who serves in a position that "is ***important to the spiritual and pastoral mission of the church***." *Skrzypczak v. Roman Cath. Diocese of Tulsa*, 611 F3d 1238, 1243 (10th Cir. 2010) (quoting *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F. 2d 1164, 1169 (4th Cir. 1985) (emphasis added).

As stated, the *Our Lady of Guadalupe* factors are not to be followed as a rigid approach and none of them are dispositive. However, the present facts show that Mr. Chapla meets all of these factors, making him a minister for purposes of the ministerial exception's application as a matter of law.

### i.    *The AOP, OCE and Fr. Judge have religious missions and objectives.*

The undisputed discovery record forecloses any doubt that the Defendants have established mission statements, adopted principles, policies and procedures, belief statements, and handbooks that articulate their overarching, decidedly Roman Catholic religions objectives. Indeed, faith lies at "the core" of these institutions.

The OCE's mission is to promote the advancement of diocesan high schools, with a focusing on "developing young adults through Catholic value based education." SUF at 5 – 8. The OCE objectives are "[r]ooted in Gospel values and guided by our Catholic faith, our schools assist

students in the development of moral viewpoints and ethical values which will help guide them as they become the leaders of tomorrow." SUF at 9.

The Mission Statement of the AOP emphases the objective to "teach the saving message of Christ." SUF at 4. Similarly, the AOP identifies and affirms five (5) essential principles as hallmarks of a Catholic Education, including the objective to "prepare sudents for a life based on Gospel values and a commitment of services to others." SUF at 10. Each school, including Fr. Judge, had a focus on objectives such as "developing young adults through Catholic value based education," and "developing students to become missionary disciples." SUF at 5-8.

The policy of the AOP Secretariate of Catholic Education provides that "the principal has the majority responsibility for the religious education program of the school." SUF at 24. As part of its effort to emphasize these priorities, the OCE new administrator orientation trainings address "Catholic Identity" specifically. SUF at 148. They also conduct mandatory spiritual retreats for administrators. SUF at 140. Indeed, the record confirms that administrators, including OCE principals, are required to participate in mandatory spiritual retreats conducted in the Roman Catholic tradition to advance their own relationship with God and develop methods to advance the spiritual mission of their respective schools. SUF at 12.

The commitment to the principles of Catholic Education is also at the forefront of the governing Labor Management Agreement between the administrators and faculty at OCE schools, including Fr. Judge. SUF at 17. It includes an introductory statement that stresses, for example, the aim "to foster the building of a Catholic community," and recognizes the schools as "an integral part of the Church's mission to teach young people how to proclaim the Gospel, build faith communities, celebrate through worship and service to others." *Id.*

With Catholic Identity as a focal point, the AOP's Teacher Induction Plan for new faculty includes reference to prayer, teachings of the Church, building faith, and "witness[ing] Christian Virtues" as "targeted domains." SUF at 18. Indeed, the principal is expressly identified as part of the "induction team," and has the responsibility to adjudicate teachers on their own understanding of AOP's Catholic Identity, Mission Statement, and Belief Statements in addition to "fostering a Catholic atmosphere" in the classroom. SUF at 20-21.  Mr. Chapla acknowledged his participation as principal. SUF at 65.

Principals are also bound by, and obligated to ensure compliance with, the AOP's Standards of Ministerial Behavior and Boundaries, which provide in part that "[t]he goal of all activities in the Church is to share the Good News of God's love, salvation and mercy with all people." SUF at 22, 25.

As further evidence that ministerial functions were an essential component of Mr. Chapla's position, consider also that the "Professional Performance Reflective Instrument" used to adjudicate principal performance lists Catholic Witness" as the *first* performance factor. SUF at 72.  Consider also the following as completed by Mr. Chapla himself:

Office of Catholic Education
2018-2019
Professional Performance Reflective Instrument
(Secondary School Administrators)

Last Name: **Chapla**                    First Name: **Peter**

Position: **Principal**                    Years in Position: **1**

Location: **Father Judge High School**

Use the form below to reflect on your professional performance and then rate your performance for each category using the following:

I am *Distinguished* in this area = 4
I am *Proficient* in this area = 3
I am *Basic* in this area = 2
I need to work on *Improving* this area = 1 Use a Separate Sheet if necessary

| Performance Factor | Reflection on Performance | Rating |
|---|---|---|
| Catholic Witness | *In both his actions and communications, written and verbal, Pete Chapla has provided a consistent example of what it means to carry oneself as a Salesian Gentleman. This consistent message extends beyond the students as Pete keeps consistency in this Performance Factor with the faculty, staff, Board, prospective families/students, and potential partners in advancing our academic initiatives.* | 3 |

*Id.*

Similarly, at all times relevant, Fr. Judge maintained the following Mission Statement and Belief Statement:

## **Mission Statement**

Father Judge High School provides a climate of academic excellence within a safe environment that respects the diversity of each student. Rooted in the spirituality of St. Francis de Sales, we educate the whole young man spiritually, intellectually, physically, emotionally, and socially in the Catholic Tradition.

12

## Our Belief Statements

We Believe...

1. As did our patron Saint that you should not wish to be anything except who you are and strive to be that well.
2. Each student has the capacity to develop his spiritual, emotional, and intellectual gifts to his fullest potential to become a viable member of the community.
3. The student who perseveres in the face of challenge will succeed in life personally, professionally, and spiritually.
4. A willingness to consider, change, and implement new ideas is necessary for continuous improvement.
5. In an increasingly uncertain world, our core values will endure, providing our students with a sense of stability as they face the challenges of the future.
6. Our sacramental celebrations promote a sharing and building of our Christian faith community.
7. Parents, families and faculty that work together will help our students reach their goals.
8. In continuing our tradition of success. Non Excedit!
9. A Salesian Gentleman does all things with humility and respect.

SUF at 28. The school is "firmly and publicly committed to the principles of Catholic Doctrine and Morality, as set forth more fully in its stated Objectives:

## Objectives

Father Judge is firmly and publicly committed to the principles of Catholic Doctrine and morality. We provide an atmosphere which encourages the students to express their religious beliefs, strengthen their family relationships, reflect on moral choices, respect human dignity, care about the welfare of others, and recognize the good in each other.

Students are educated according to their God-given talents. Our curriculum meets, as nearly as possible, each individual student's needs allowing him to experience the relevance of learning through vital points of connection between skill and content.

Father Judge provides a program of group and individual activities designed to develop the physical well-being of the students.

Through social interaction, Father Judge offers a variety of opportunities for students to clarify their values and develop self-esteem through relationships with others

SUF at 29. Per the school's "Profile of Graduates" a graduate of Fr. Judge "will be a Salesian gentleman who demonstrates a lifelong appreciation for…spiritual values that realize our relationship with God." SUF at 39.

The faculty handbook introduction provides that Fr. Judge "was founded to develop, within the young men who attend the school, a commitment to the ultimate goals of the Catholic faith." It explicitly references that it is intended for administrators. See:

### Introduction

Father Judge High School is a Catholic high school within the Philadelphia Archdiocesan School System, administered and staffed by Catholic lay men and women and by priests, brothers, and seminarians of the religious congregation of the Oblates of St. Francis de Sales.
Father Judge High School was founded to develop, within the young men who attend the school, a commitment to the ultimate goals of the Catholic faith. The total program, curricular and extracurricular, is designed to achieve this objective while providing for the varying abilities of each student.

We strive through word and example, to create a school community enlivened by the spirit of the gospel message. We aim to assist each young man in developing himself mentally, emotionally, physically, and spiritually. We strive ultimately to relate all human culture to the good news of salvation so that the light of faith will illumine the knowledge each student gains of the world, of life, and of mankind. We strive to help each other grow in his knowledge of his place in society and in his understanding of his responsibility to his God, to his fellow man, to his country, and to himself.

This faculty handbook is intended as a reference instrument whereby the members of the administration, faculty, and staff can find the information necessary for the orderly and efficient running of the school community. The handbook describes the services offered the students and enumerates and explains the procedures to be followed by faculty, staff and students. It contains a code of acceptable behavior for students and a list of responsibilities for teachers and staff

The handbook is designed to be a useful and practical tool for both new and experienced teachers. Its value will be determined by the degree of seriousness and responsibility with which each teacher views its content.

SUF at 30.

Mr. Chapla concedes that he was governed by the [Fr. Judge] Mission Statement, the Introduction, [and the] Statement of Beliefs in his role as principal of Fr. Judge. SUF at 69. (Q: As a principal – or as a leader of any organization, would you agree it's incumbent on you to kind of work in consistency and in furtherance of the mission, no matter what it may be? A: Yes."). It was required that he further the objectives of the mission statements. SUF at 70. He further agreed that the school introduction, stating that the school was founded to "develop a commitment to the ultimate goals of the Catholic Faith," represents "the reason Father Judge exists as a school system in the first place." SUF at 30, 71.

Like Defendants' respective missions and stated objectives, the defendant school's mission in *Our Lady of Guadalupe* was centered on educating and forming students in the Catholic faith.

140 S. Ct. at 2066. Indeed, the aforementioned mission statements in addition to other policies and stated purposes and commitments confirm that all Defendants identified themselves as Roman Catholic entities with the faith at the core of their existence. *See Simon v. Saint Dominic Acad.*, Civil Action No. 19-cv-21271, 2021 U.S. Dist. LEXIS 247351, at *10 (D.N.J. Dec. 29, 2021) (holding the ministerial exception because, in part, the stated mission confirms defendant was "*first and foremost a Catholic institution.*") Indeed, consideration of this factor overwhelmingly favors finding application of the ministerial exception.

### ii.    *Mr. Chapla's articulated job requirements address ministerial obligations.*

The record demonstrates that the Defendants have consistently identified the role of Fr. Judge Principal as having ministerial functions. This is evidenced by the job posting, job requirements, application priorities, and handbook's articulation of the principal's role. SUF at 22, 40, 41-43, 46-52.

Consider Mr. Chapla's acknowledgement that, even at the point of hire, he knew Fr. Judge was not looking for him to promote a general positive message but was looking for "a specific Catholic message and a Salesian message." He testified:

> Q: You understood, through your application process, that the Archdiocese of Philadelphia was not looking for you to just have a general positive message though? They were looking for – for a specific Catholic message and a Salesian message, is that right?
>
> A: Yes, the Salesian identity.

SUF at 49.

Consider also that the job posting begins by announcing that "the Principal has both the authority and responsibility for …. improvement along with our mission of fostering a safe environment that produces Salesian Gentlemen in the image of the school patron, St. Francis De Sales, a focus unique to Father Judge and the Oblates of St. Francis de Sales. SUF at 40; *see also*

15

SUF at 31-34.  The same posting identifies "Catholic Identity" as the first primary job responsibility. SUF at 41.

In preparation for candidate evaluations, the interview outline articulates topics for discussion and first lists "Catholic Identity," relating specifically to criteria such as understanding the aim of "equipping saints for life in this world and the next," and inquiring about the intersection of Catholic Faith and the position and the commitment to the Catholic Church and its educational mission. SUF at 46. Regardless of whether Mr. Chapla addressed such questions or topics in detail, the outline's inclusion demonstrates the articulated priorities.

When reviewing Mr. Chapla's credentials as part of the principal hiring process, Fr. Judge President Brian King ("Mr. King") recognized that Mr. Chapla had "Catholic Roots" based on Mr. Chapla's attendance at two Roman Catholic institutions of higher learning. SUF at 48, 52. Indeed, Mr. Chapla met the requirement to confirm his status as an active, practicing Roman Catholic by submitting the requisite confirmation from his local pastor reflecting his active registration and, therefore, eligibility for the principal position. SUF at 50-51. His offer letter addresses that express requirement as a condition of employment. SUF at 50.

The Fr. Judge Faculty handbook also provides a detailed account of the job duties for respective positions, including principal, and specifically notes that the principal has "***authority and responsibility for the daily operations of the school***," expressly including "***school ministry***." SUF at 44 (emphasis added). Similarly, the duties listed for the respective assistant principals articulate that they "***assist[] the principal in visible, spiritual and pastoral leadership of the school community***," and provides that the campus minister must "***cooperate with the principal in integrating catholic faith and culture into the school's entire program***." SUF at 45 (emphasis added).

16

Mr. King testified that, having witnessed Mr. Chapla and others perform the job of Fr. Judge Principal, ministry it is indeed a primary job function. SUF at 92. Mr. King testified as follows regarding Mr. Chapla's job duties, stating:

> Pete was responsible for the deployment, right, of the mission, living the mission, being a part of the mission day in day out, working with those who were on the front lines of speaking about who we are as a Salesian institution, masses, retreats, measuring the impact, improving those, working with those who were distributing it, being a mode of that each and every day.

SUF at 93. Per Mr. King the "[p]rincipal's role is both serve as the leader in the forefront and model it every day, simultaneously working with the school community to model and live out those statements of belief in that mission statement that represents the institution." SUF at 94.

Similarly, Father Joseph Campellone, an Oblate priest serving Fr. Judge during Mr. Chapla's tenure, identified the principal as "the overseer of catholic culture of the school," and referred to Mr. Chapla in the role as "***the pastor of the school***." SUF at 109 (emphasis added). Fr. Campellone explained the overall shift in Catholic Education to utilize lay administrators to serve both the educational and ministerial roles historically held by members of the clergy serving Roman Catholic schools. SUF at 110. ("So we don't have that many priests in the religion classes;…So in education at a catholic school, you know, the laities moved on to take a lot of those roles on in the church to maintain spirituality.") On this point, Mr. Chapla acknowledged that his predecessor in the principal role, Fr. Jack Kolodzij ("Fr. Jack"), likely performed all of the same duties that he performed but-for the fact that Fr. Jack could also perform sacraments as an ordained priest. SUF at 33.

Perhaps most telling, Mr. Chapla acknowledged at deposition: as principal, he was "required to improve ministerial function" at the school. SUF at 146.

Aside from the Supreme Court in *Our Lady of Guadalupe*, other courts have also found job listings and job applications germane to determine if the position appropriately classifies as ministerial. *Butler v. St. Stanislaus Kostka Catholic Acad.*, 609 F. Supp. 3d 184, 194 (E.D.N.Y. 2022) (granting summary judgment for school because a teacher's claims were barred by the ministerial exception based, in part, on the job posting seeking a "qualified and committed catholic educator to advance the mission of catholic schools.") see also *Starkey v. Roman Catholic Archdiocese of Indianapolis*, 496 F. Supp. 3d 1195 (S.D. Ind. 2020) (holding guidance counselor was a "minister" under the exception based on duties.). When compared to the competent record evidence regarding the AOP, OCE and Fr. Judge's description and explanation of the job and its duties, the law once again supports finding in favor of Defendants.

### iii. *Faculty and student handbooks affirm Roman Catholic priorities.*

Reviewing the respective Fr. Judge Student and Faculty handbooks reveals a multitude of references and affirmations regarding its unwavering commitment to the teachings of St. Francis de Sales and the goals of Roman Catholic education.

The relevant Fr. Judge handbooks demonstrate the school's expectation for the principal to serve a ministerial and an administrative role. As addressed, the Fr. Judge Faculty Handbook also outlines the "duties and responsibilities" of various positions, including that of the principal, and provides that "the principal, as chief operating office of the school has both the authority and responsibility for the daily operations of the school," expressly including authority and responsibility for "***school ministry***." SUF at 44 (emphasis added).

Also, the handbooks for faculty and staff reflect the aforementioned Mission Statement, Belief Statement, Objectives, and overall commitment to the traditions of St. Francis de Sales, the "patron saint." SUF at 27. The student handbook clarifies that religious retreats "are an integral

part of life at Fr. Judge" and have "priority over all other extracurricular activities." SUF at 38. The handbook also provides guidance relative to Christian service obligations and Campus Ministry. SUF at 35, 37.

This Court should indeed look to the faculty handbook to determine how employees such as Mr. Chapla were called to model and exemplify Gospel values and the Roman Catholic tradition. Indeed, the fact that the Faculty Handbook includes administrators in the school's introductory statement mission statement clarifies that the expectations for Catholic Identity applied beyond the student or teacher populations. *See* 27, 34. *See Our Lady of Guadalupe,* 140 S. Ct. at 2058-59; *Butler,* 609 F. Supp. 3d at 194, *Fratello,* 863 F.3d at 193. Here, akin to the factual background and record in *Our Lady of Guadalupe, Butler, Zaleuke,* and *Fratello* the record confirms specific and clear recognition of Catholic and, more specifically, Salesian priorities in the key documents that direct the school.

### iv.    *Mr. Chapla had ultimate authority and oversight over religious teaching.*

In determining whether the ministerial exception applies, it is appropriate that This Court consider the religious teachings and the Fr. Judge curriculum for which Mr. Chapla, as principal, had ultimate responsibility. *Our Lady of Guadalupe*, 140 S. Ct. at 2057; SUF at 44. Per the Supreme Court in *Our Lady of Guadalupe*, "the prescribed curriculum [teachers were] expected to teach students, among other things, to learn and express belief that Jesus is the son of God and the Word made flesh; to identify the ways the church carries on the mission of Jesus." *Our Lady of Guadalupe*, 140 S. Ct. at 2057. Mr. Chapla was not a teacher but, more significantly, he exercised oversight of the teachers and adjudicated all faculty, including but not limited to members of the Theology Department, relative to their exhibition of "Catholic Identity" based on his observations. SUF at 153.

19

At Fr. Judge, students were required to complete four (4) credits of Theology and fifteen (15) hours of Christian Service to graduate. SUF at 35. The community is required to "begin and end each day with public prayer over the PA system," and "each class also begins with a prayer." SUF at 36. Students must also learn the traditional Salesian prayer, the Direction of Intention. SUF at 89-91. Mr. Chapla testified that the administrators would tell new students that the Direction of Intention "is part of our culture. You're going to hear this a lot, so get used to it." SUF at 90. Mr. Chapla participated in the theology curriculum not only by adjudicating the teachers, but meeting through academic council. SUF at 96. In fact, during his tenure, the Theology Department added a course on diversity and faith, approved by Mr. Chapla. SUF at 124.

Mr. Chapla adjudicated all faculty and staff relative to "Catholic Identity" as a distinctive performance criterion. SUF at 18, 153. This included his detailed comments on theology, Salesian thought, and Catholic Identity in reviews for members of the Fr. Judge Theology Department. SUF at 154. Per Andrew Dolan, a faculty member within the department, Mr. Chapla necessarily needed some personal background and context in Catholicism to provide such adjudications. SUF at 158.

### v.    *Mr. Chapla had ultimate responsibility for faith formation,* **ie.** *Catechesis*

To perform his job duties, Mr. Chapla necessarily had to function as a "catechist," and did perform such a function. The Supreme Court defined catechists to be those "responsible for the faith formation of the students in their charge each day." *Our Lady of Guadalupe*, 140 S. Ct. at 2057. As principal, Mr. Chapla had ultimate responsibility for the faith formation of all students at Father Judge High School, and he was also responsible for serving as a model for the school's values. SUF at 25, 26.

Although not directly involved in teaching as a member of the Theology Department or serving as the Campus Minister, Mr. Chapla had ultimate responsibility for the success of these colleagues and he played a significant role in the faith formation of Fr. Judge students. *See* SUF at 14, 37 (confirming Campus Minister reports directly to the principal); SUF at 154 (adjudication of Theology Department faculty).

The record demonstrates that Mr. Chapla collaborated regularly with the AOP Office of Catechetical Formation (OCF) to manage retreats and the overall function of the Campus Ministry Department at Fr. Judge. SUF at 15, 97, 98, 152. Indeed, as principal, he served this function because he had "authority and responsibility" for campus ministry and other daily operations. SUF at 44.

Although not always tasked with preparing the agenda or selecting prayers, Mr. Chapla was the "supervisor" of retreat planner, Mr. Williams, and often provided him with advanced guidance and feedback in that context. *See* SUF at 14, 93, 95, 100-105, 125 (referencing intent to share his "perspective as [the minister's] supervisor on the retreat" per an email to Ms. Menna); 130 (requesting that Mr. Williams "brief me on logistics and planning of the retreat.") 135 (emailing Fr. Jack and administrators to "sit down with all of you and prepare a detailed plan for retreats."); 136 (building future retreat leaders), 137 (instructing faculty and staff to attend a retreat); 138 (requesting update on presentation plan for OCE visit); 139 (proposing retreat session on "topics important to Salesian Virtues.") Per Mr. Williams, Mr. Chapla gave him specific feedback regarding the spiritual focus of these retreats, reminding him to "keep it Salesian" and focus on the "Salesian Ethos of the school." SUF at 104-105. The Campus Minister testified that he considered Mr. Chapla the "lead minister," from whom he would seek and gain direction. SUF at 99.

Mr. Chapla understood that, at Fr. Judge, he "needed" to be versed in Salesian identity. He testified that he "**_had to learn_**" about Salesian spirituality because he "**_needed to be aware of what that entailed_**." SUF at 66 (emphasis added). In fact, he emphasized this to new teachers, testifying that he would tell them "you have to get used to this concept of Salesian identity." SUF at 65. He regularly emphasized the focus on Salesian identity by referencing the "Salesian Gentlemen" and adopting the signature line "Live Today Well," which ties specifically to the teachings of St. Francis de Sales. SUF at 34, 67, 108, 111, 112, 113, 115, 124, 142, 144, 154(j). He testified that he "understood the tenets of Salesian identity," adding "that was not lost on me." SUF at 64.

Mr. Chapla also served as a member of the "Campus Ministry Team," meeting with faculty from the Theology Department and the Campus Minster to address spirituality and Salesian focus at Fr. Judge. SUF at 77. In fact, he took and distributed minutes for the group. *Id.*

Mr. Chapla even functioned as a catechist for his staff, as evidenced by Mr. Williams' testimony relating not only to Mr. Chapla's account of a mass during Desert Storm, but also when testifying that he felt comfortable discussing matters of spirituality with Mr. Chapla: "It's like, if I can't go to the principal and feel like I can talk about my spiritual void or needs, you know, I'm in trouble…" SUF at 123.

    *vi.*       *Mr. Chapla led and participated in prayer, masses, retreats and events.*

Additionally, *Our Lady of Guadalupe* looked to the individual's participation in prayer. There, one teacher was "expected to attend faculty prayer services," participate in "school liturgical activities," "select and prepare students to read at mass," and "take students to mass." *Our Lady of Guadalupe*, 140 S. Ct. at 2056-7.

Extensive, undisputed record evidence reveal that Mr. Chapla most decidedly engaged in prayer as part of his job function at Fr. Judge. Examples include the following, pulled from not only the statements and observations of his colleagues, but very often from Mr. Chapla himself.

Mr. Chapla acknowledges that he "attended every single mass that was scheduled," once serving as a Eucharistic Minister, and went on "most" retreats. SUF at 78, 79. As addressed, Mr. Chapla played an active role at his own Induction Mass – celebrated specifically to welcome him to the community and his ministerial role, and to bless him in his execution of his position. SUF at 53-62. The Induction Mass is, indeed, a religious ceremony SUF at 54. Mr. Chapla attended and participated in his own Induction Mass "to affirm his role as the leader of the school community and to affirm that he would lead those beliefs of the school and that Salesian charism of the Obligates of St. Francis DeSales." *Id.* at 54-55. Indeed, during the mass and before the celebrating Oblate priest and guests, he made the following pledge:

> **Mr. Chapla:** Sister Maureen, Father Jack, Mr. King, invited guests and the entire student body ... I pledge to lead, guide and administer this school with the authority given to me by the Office of Catholic Education and the moral authority handed down by the Oblates of St. Francis de Sales. I promise to seek always the intercession of St. Francis de Sales and the prayers of this community to conduct myself as the Principal of Father Judge High School in a manner most pleasing to God. May God be blessed.

SUF at 59. Additionally, he had the opportunity to refuse or edit given his advanced review of the program, but did not do so. SUF at 56.

Mr. Chapla also participated actively in the Ring Mass, sharing responsibility with another administrator to stand at the altar and distribute the class rings, newly blessed by the presiding priest as the students processed toward the administrators at the altar. SUF at 80; 156-158. The Mass has significance beyond merely distribution of the rings to seniors; Mr. King explained the administrators' participation in the Ring Mass is "more meaningful" than just passing out the rings.

23

He testified that the mass recognizes the "maturation process," and relates to "forming their morale compass,..in that goal to something Pete [Chapla] frequently spoke to, about being a Salesian gentle[man]…" SUF at 157, 158.

Mr. Chapla agreed that school events would begin with a prayer. SUF at 75. He also concedes that he would lead prayer at faculty meetings and, "many times," he authored prayerful messages to the school community. SUF at 82-84, 88. These were not only traditional, Salesian prayers such as the "Direction of Intention," but also prayers that Mr. Chapla read and, at times, even authored himself. *See* SUF at 81-92; 127-130, 132-133. For example, consider that he read the following:

**Father Judge High School - Professional Development Zoom Session 03 April 2020**

*10 am - 1215 pm* via Zoom all faculty in attendance, admin, CORA and Catapult, CARON, Athletic Director, Technology Director (total of 60)

***Prayer*** *led by Principal Chapla*
"Dear Lord, as we gather here this morning to share our successes and challenges these past several weeks, please continue to guide us to use all of our talents and gifts you have given us to provide the best possible instruction for our students. We ask You to bless and keep our students, families and all Father Judge family of teachers, administrators and staff safe and healthy as we prepare to enter Holy Week in the next few days. Please guide us to grow together and give all of our efforts to helping develop our Salesian Gentlemen to be who they are and to be that well. We ask this through your humble Servant, Jesus Christ. Amen"

SUF at 127. At the same meeting, per the minutes, Mr. Chapla "reviewed the importance of reflection and preparation for Holy Week." SUF at 128.

In an email to faculty dated August 30, 2021, Mr. Chapla included his personal encouragement for all personnel to attend mass, adding in his own voice this prayer: "As we begin the new year of school, *may we ask for the Lord's blessing on all that we do for our students and families*." SUF at 129 (emphasis added). Similarly, when Mr. Chapla emailed the faculty and staff on April 8, 2020, circulating a Holy Week Retreat faculty handout, he closed his emails with his

prayer: "***May the Peace of Christ be with you all, and thank you once again for all that you do for our students and their families***." SUF at 133 (emphasis added).

Even if Mr. Chapla had focused on or otherwise led only the traditionally scripted, Salesian prayers such as the Direction of Intention, such conduct nevertheless classifies as ministerial and can even exhibit a more specific focus on Roman Catholic tradition than would another type of prayer. Per. Mr. King, the Direction of Intention is "a specific prayer, very specific to who [Fr. Judge is] as a catholic school." SUF at 118. When asked if reading the Direction of Intention was in any way more or less ministerial than reading, for example, a Bible passage, Mr. King explained that reading the Direction of Intention was actually "a deeper dive," and is "very specific to who we are as a catholic school." *Id.*

The record includes a multitude of other examples, such as when Mr. Chapla communicated the importance of faith development and meeting spiritual needs during the pandemic (SUF at 126, 134), encouraged mass and retreat attendance (SUF at 137), and recommended prayer and reflection for the faculty (SUF at 131). As mentioned, he also shared a personal account of his faith with students, addressing the experience of attending mass in the desert while serving in Operation Desert Storm. SUF at 76; *see also* 122.

Mr. Chapla also acknowledged his obligation to attend and participate in OCE retreats for administrators. SUF at 140; *see also* 147, 149. The purpose for the retreats was to address faith and inspire administrators to return ideas to their school communities. SUF at 141. Mr. Williams testified to recalling Mr. Chapla doing just that. SUF at 150. Indeed, Mr. Chapla returned from one such retreat and addressed ideas to promote Salesian identity at Fr. Judge, advising as follows:



Pete Chapla <pchapla@fatherjudge.com>

---

**Salesian development**
4 messages

**Pete Chapla** <pchapla@fatherjudge.com>                        Mon, Dec 9, 2019 at 12:43 PM
To: Maureen Dwyer <mdwyer@fatherjudge.com>, Mike Campellone <mcampellone@fatherjudge.com>
Cc: Shane Dougherty <sdougherty@fatherjudge.com>
Bcc: James Hozier <jhozier@fatherjudge.com>, Brian Patrick King <bking@fatherjudge.com>

Maureen and Mike,

After spending two days last week at Avalon with Father Jim Greenfield leading our retreat, I have come away with a
deeper understanding of our Salesian identity.  In conversations with you both, as well as with other members of the
theology department, I think it would be a good idea for us to think about improving how we do our programs to develop
Salesian gentlemen.  I think there are a lot of good things going on to that end, but there is certainly room for us to figure
out how to improve the process.

SUF at 142. He proposed open discussion to "***help our Salesian identity become more proactive,***
***detailed and most of all collectively improved***." SUF at 143 (emphasis added). While he praised
his colleagues' efforts to "***make our students more aware of Living Jesus and more importantly,***
***helping all of our students gain a better understanding of the Judge student as a Salesian***
***Gentlemen 24/7, both here at school and out in the community***," he also proposed initial meeting
to include Fr. Judge Theology Department leaders and the Fr. Judge Assistant Principal to join
him and "get some dialogue going." SUF at 144-145 (emphasis added).

Finally, by making reference to the concepts and aspirational goal of being a "Salesian
Gentleman," Mr. Chapla regularly reflected his own understanding of St. Francis de Sales'
teachings and philosophy in a meaningful way. *See* SUF at 108, 111-115. Similarly, by using the
Salesian specific email signature line "Live today well," Mr. Chapla effectively closed all email
correspondence with a Salesian-specific, prayerful directive to the recipient. SUF at 67; *see also*
SUF at 31-32; 34.

### vii.    *Mr. Chapla provided visible, recognized ministerial leadership at Fr. Judge.*

Aside from the factors laid out in *Our Lady of Guadalupe*, other courts have recently looked
to additional considerations such as whether the individual had "important religious functions."
See *Zaleuke*, 2021 U.S. Dist. LEXIS 214496 at *17. Such an analysis is instructive in this case. In

26

addition to the many aforementioned religious obligations and engagement, Mr. Chapla regularly engaged in visible, active religious leadership during his tenure as principal such that he did, effectively, serve as a "pastor" or "minister" for Fr. Judge in his principal capacity.

Even if Mr. Chapla were to argue that he did not perform a ministerial task by making the referenced pledge at his own Induction Mass, or by distributing the blessed rings at the alter during the Ring Mass, there's no valid premise to refute that his participation – in the presence of the entire school community including clergy, faculty, administrators, Fr. Judge Board Members, etc. - carried significance relative to the Fr. Judge Mission, Belief Statement, and overall identity. SUF at 53-62. Indeed, the school's social media posting commemorated the occasions. SUF at 55.

As addressed, Mr. Chapla not only utilized the standard Fr. Judge letterhead referencing the mission to "educating our students' minds and souls to the spirit of our patron saint, St. Francis de Sales," but he also chose to adopt the "Live Today Well" email signature line in recognition of Salesian spirituality. SUF at 67, 68.

Whether he participated for personal growth or, as he may allege, to supervise student behavior, Mr. Chapla attended mass at Fr. Judge, participated in the responses and communion, and encouraged others to do so. SUF at 14, 78, 137, 139. When asked about participation, he testified that he participated as he would in his own parish. *Id.* Indeed, this presents an example of spiritual leadership-by-example consistent with the OCE rationale to require that principals are practicing Roman Catholics, registered at a parish. SUF at 51-51.

Mr. Chapla's public and visible involvement in Fr. Judge's ministerial missions can be likened to those in other cases where courts applied the ministerial exception to preclude claims even if he did not perceive himself as performing a religious function. In *Zaleuke v. Archdiocese of St. Louis*, the court granted summary judgement, barring an elementary catholic school lay

principal's claims under the ministerial exception. *Zaleuke*, 2021 U.S. Dist. LEXIS 214496. There, the court found the record showed the defendant expected the principal to participate in spiritual leadership, report to religious leadership, direct religious education, attended weekly parish meetings, and retreats for the leadership and pastoral teams. *Zaleuke*, 2021 U.S. Dist. LEXIS 214496. These are similar, indeed, to the previously cited obligations of Mr. Chapla relative to leading the school's spiritual mission, reporting to OCF and OCE administrators, overseeing the Theology Department, serving on the Campus Ministry Team, and supervising student and faculty retreats in the public's view.   The court rejected the principal's own perception of the role, explaining that her perception did not weigh into the analysis; what mattered was that defendants considered the principal "to be a spiritual leader in the school community and she performed work related to defendants' religious mission." 2021 U.S. Dist. LEXIS 214496 at *18-9.

The 2023 opinion in *Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529, also articulates this point. The plaintiff, a guidance counselor, was deemed a minister primarily because of her membership on the school's administrative council making her a "key, visible leader". *Roncalli,* 73 F.4th at 532. The court determined that membership included "participation in at least some religious planning and discussion," citing to planning details of a religious service, discussions relating to mass and discussions on holding a prayer service for victims of a school shooting. *Roncalli,* 73 F.4th at 532.

The analysis in *Fratello v. Archdiocese of N.Y.,* 863 F.3d 190, also proves instructive. There the court granted summary judgement, finding the lay principal's claims were barred by the ministerial exception. *Id.* The court noted the significance of the principal's religious functions such as hosting students in the office to read the morning prayer over the loudspeaker, communicating religious messages over the loudspeaker during the holiday season, helping plan

and execute religious ceremonies, as well as drafting the monthly newsletter, which among other things, invited the students to mass. *Id.*

Indeed, when evaluated relative to the underlying record in the instant case, the facts in *Fratello, Fitzgerald,* and *Zaleuke* are analogous and compel the same conclusion: regardless of title or training, principals at Roman Catholic parochial schools who regularly perform visible, religious, ministerial duties by engaging in faith-based activities are ministerial. *See also Braun v. St. Pius X Par.,* 827 F. Supp. 2d 1312, 1318 (N.D. Okla. 2011) ("a principal of a parochial school fits within the ministerial exemption."); *Temple Emanuel of Newotwn v. Mass. Comm'n Against Discrim.*, 975 N.E.2d 433, 443 (Mass. 2021)(holding that a Jewish school teacher without the "rabbi" title or any religious training was nevertheless covered by the ministerial exception.

### B. <u>The Ministerial Exception Applies to Lay Employees Who Delegate Ministerial Tasks</u>

Defendants anticipate Plaintiff refuting his status as a ministerial employee because, in some instances, he oversaw or delegated ministerial tasks to members of the Campus Ministry Team, Theology Department, or affiliated Oblates of St. Francis de Sales. *See* ECF Doc. 9, Ex. A. To the extent he may claim that he merely supervised or oversaw these department employees in their own performance of ministerial functions, his argument does nothing to divorce him of his own ministerial obligations and functions. *See Petruska v. Gannon Univ.,* 462 F.3d 294, 307 n.10 (3d Cir. 2006) ("To the extent that [an employee] supervises spiritual functionaries, at least some of the functions he performs are, by definition, spiritual ones.").

Further, as explained, title alone does not determine application of the ministerial exception. Accordingly, the fact that Plaintiff may deny ministerial functions because he received benefits designated for "lay employees," rather than clergy or formal ministers, does nothing to negate application of the ministerial exception. See ECF Doc. 9, Ex. A, B. Indeed, if any of the plaintiffs in *Our Lady of Guadalupe*,

*Hosanna-Tabor*, *Fratello,* or other analogous (binding or otherwise instructive) ministerial exception cases worked as an employee of Defendants, those individuals would have also received "lay" benefits because none classified as ordained members of the clergy or members of a religious order.

The undisputed fact that Mr. Chapla functioned as a lay principal rather than a teacher has does not impact This Court's analysis. While many of the judicial precedent relating to the ministerial exception relates to teachers, following the *Our Lady of Guadalupe* ruling, the 9th Circuit has held that, "in the context of the ministerial exception, there is no principled distinction to be drawn between teachers and principals. Thus under the Supreme Court's formulation of the ministerial exception [the principal] qualified for its application to him.*" Orr v. Christian Bros. High Sch*., No. 21-15109, 2021 U.S. App. LEXIS 34810, at *2-3 (9th Cir. Nov. 23, 2021) (holding the principal was barred from their claims by the ministerial exception). Not only have courts found the ministerial exception to apply to principals, but state and federal courts have ***uniformly*** held principals of catholic school, like Father Judge High School to be ministers within the meaning of the ministerial exception. *See Orr,* 2021 U.S. App. LEXIS 34810; *See also Fratello,* 863 F.3d 190 (holding Catholic school principal was a "minister" so her gender discrimination and retaliation claims were properly dismissed through summary judgement); *Zaleuke,* 2021 U.S. Dist. LEXIS 214496 (granting summary judgement, barring a catholic school lay principal's claims under the ministerial exception.) *Nolen v. Diocese of Birmingham in Ala.,* 2017 U.S. Dist. LEXIS 141496 at *9-11 (N.D. Ala. Sep. 1, 2017, No. 5:16-cv-00238) (granting summary judgement finding a catholic school principal who lacked a formal religious title and performed non-religious tasks still possessed a significant "role in conveying the Church's message and carrying out its mission" therefore barring her claims under the ministerial exception.); *Ginalski v. Diocese of Gary*, 2016 U.S. Dist. LEXIS 168014 at *23 (N.D. Ind. Dec. 5, 2016) ("the ministerial role

assigned to and accepted by [the principal] as head of the Catholic high school were sufficient to find that the plaintiff was a minister for the purposes of the exception.); *Dayner v. Archdiocese of Hartford*, 23 A.3d 1192, 1205 (Conn. 2011) ("the plaintiffs duties as a Catholic school principal render her a ministerial employee");  *Pardue v. Ctr. City Consortium Schs. of Archdiocese of Wash.*, 875 A.2d 669, 677 (D.C. 2005) (applying the ministerial exception and explaining that, "more than anyone else at the school except the pastor," the "principal of a Roman Catholic school" is responsible "for providing . . . spiritual leadership in and for the school community" and is "inextricably intertwined" in the school's mission); *Sabatino v. St. Aloysius Par.*, 672 A.2d 217 (N.J. Super. Ct. App. Div. 1996) (applying the ministerial exception to school principal by finding the principal was "in charge of students' religious education," "supervise[d] the teachers, play[ed] a significant role in curriculum development, [was] a liaison between the school and the religious community, and [was] the guiding force behind the school's spiritual mission.").

For all these reasons, the undisputed record unequivocally demonstrates that the ministerial exception applies, and claims must be dismissed as a matter of law.

[remainder of page left blank]

31

## <u>CONCLUSION</u>

For all these reasons, Defendant respectfully requests that this Court enter an Order pursuant to Fed. R. Civ. P. 56 dismissing Plaintiff's Complaint with prejudice.

Respectfully submitted,

**JACKSON LEWIS P.C.**

*/s/ Eileen K. Keefe*
Eileen K. Keefe
Sophia Czerniecki
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102
T: (267) 319-7802
F: (215) 399-2249
Eileen.Keefe@jacksonlewis.com
Sophia.Czerniecki@jacksonlewis.com

ATTORNEY FOR DEFENDANT

Dated:   January 16, 2024

4885-2873-6157, v. 5

32