# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PETER CHAPLA | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | CASE NO.: 22-3971 |
| v. | : | |
| | : | |
| FATHER JUDGE HIGH SCHOOL | : | |
| and | : | |
| THE ARCHDIOCESE OF PHILADELPHIIA | : | |
| D/B/A ARCHDIOCESE OF PHILADELPHIA | : | |
| SCHOOLS (SECONDARY SCHOOLS) | : | |
| and | : | |
| THE OFFICE OF CATHOLIC EDUCATION | : | |
| | : | |
| Defendants. | : | |
| | : | |

## DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56

Of Counsel and on the Brief:
    Eileen Keefe, Esq.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT .............................................................................................. 1

ARGUMENTS ON REPLY ..................................................................................................... 3

    A.  Our Lady of Guadalupe Directs Courts to Consider Defendants' Job Expectations When Determining Ministerial Functions. ............................................................................... 3

    B.  "Lay Employee" and "Ministerial" Are Not Mutually Exclusive per Our Lady of Guadalupe. .................................................................................................................. 4

    C.  The Court Must Defer to Defendants' Qualification Criteria. ........................................ 4

    D.  Evaluating and Overseeing Religious Teaching and Ministry at Fr. Judge Are Ministerial Tasks. ......................................................................................................... 5

    E.  Mr. Chapla Promoted Faith Formation Through His Active, Public Participation at Fr. Judge Masses, Ceremonies, and Retreats ...................................................................... 8

    F.  Plaintiff Ignores Analogous Caselaw and Relies on Wholly Distinguishable Cases ......... 9

CONCLUSION ..................................................................................................................... 12

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*DeWeese-Boyd v. Gordan Coll.*,
   163 N.E.3d 1000 (Mass. 2022) ........................................................................................10,11

*Hosanna-Tabor Evangelical Lutheran Church & Sch. V. EEOC*,
   565 U.S. 171, 194 (2012) ........................................................................................................3

*Orr v. Christian Bros. High Sch.*,
   2021 U.S. App. LEXIS 34810 (9th Cir. Nov. 23, 2021), *cert. denied*, 143 S.
   Ct. 91 (2022) .......................................................................................................................8, 9

*Our Lady of Guadalupe School v. Morrisey-Berru*,
   140 S. Ct. 2049.......................................................................................................1, 2, 3, 4, 5, 9

*Petruska v. Gannon Univ.*,
   461 F.3d 294 (3d Cir. 2006)..................................................................................................7, 8

*Trotter v. United Lutheran Seminary*,
   2021 U.S. Dist. LEXIS 14222 (E.D. Pa. July 30, 2021)..........................................................10

**PRELIMINARY STATEMENT**

As a matter of both common sense and law, the ministerial exception applies to Plaintiff; no reasonable factfinder could find to the contrary after reviewing the extensive, undisputed record evidence showing how he actively contributed to faith formation as Fr. Judge principal. Plaintiff *admits* to performing the same types of ministerial duties that, per the United States Supreme Court, compel application of the ministerial exception and require dismissal via summary judgment.

Plaintiff incorrectly contends that Defendants assert a *per se* argument for the ministerial exception. Pl.'s opposition brief ("Pl.'s MOL"), p. 1. In actuality, Defendants' arguments focus on a precise, fact-specific account of the religious, Catholic-specific tasks that the Plaintiff himself *undisputedly did* during his tenure as principal. *See Our Lady of Guadalupe School v. Morrisey-Berru*, 140 S. Ct. 2049 ("What matters, at bottom, is what the employee actually did.") Defendants' arguments are based solely on the undisputed, competent record evidence while Plaintiff relies almost entirely on sweeping denials or dismissal of the evidentiary record. That includes, most significantly, Plaintiff's own testimony and writings.

More specifically, and by way of limited example, the competent record evidence confirms the following:

- Mr. Chapla admittedly led and, at times, wrote prayers for students, faculty, and the school community (Defendants' Statement of Undisputed Facts ("SUF") at 65-66; 82-84; 87);

- Mr. Chapla admittedly discussed the teachings of St. Francis de Sales to promote a Salesian culture at Fr. Judge (SUF at 63 – 67, 85-90, 95, 102-105, 107, 108, 111-116, 139, 142, 146);

- Mr. Chapla wrote emails to colleagues and/or the school community promoting masses, retreats, reflection, prayer and Salesian values (SUF at 125-139, 142-146);

- Mr. Chapla gave the Campus Minister Roman Catholic, Salesian-specific directives to guide his religious focus (SUF at 100-105, 112, 146);

- Mr. Chapla served on the Teacher Induction Team, focused on introducing the Catholic Identity, Mission Statement, and Belief Statements to new teachers and ultimately evaluating their performance on "foster[ing] a Catholic Atmosphere in the classroom, foster[ing] a community of faith within the school, and demonstrate[ing] Catholic values and principles." (SUF at 20-21);

- Mr. Chapla evaluated staff, including members of the Theology Department, on "Catholic Identity," scripture studies, and retreat planning in the tradition of St. Francis de Sales (SUF at 153-154);

- Plaintiff's own job performance was measured in part by his competence as a "Catholic Witness," and he in fact found his own performance to be good (SUF at 72);

- Mr. Chapla testified that, to perform as a Fr. Judge principal, he "had to learn" and "needed to be aware" of what Salesian spiritualty "entailed," and therefore he "spent a lot of time talking with the theology department, fellow administrators, and Father Jack[]" to deepen his understanding so he could perform his job (SUF at 66, 142-143);

- Mr. Chapla attended religious retreats and after at least one such retreat, proposed improving "how we do our programs to develop Salesian Gentlemen." (SUF at 66, 142-146);

- Mr. Chapla advised an Oblate priest regarding the agenda for a faculty retreat, proposing specifically that they include "topics important to Salesian Virtues." (SUF at 139);

- Mr. Chapla promoted and attended mass at Fr. Judge, and participated in the mass as he would at his own parish (SUF at 66, 137).

Plaintiff collectively refers to this extensive, uncontroverted evidence as "self-serving" or "cherry picked sound bites," and he attempts to discount it with claims that he, personally, does not deem these actions ministerial. Pl.'s MOL, pp. 5, 8, 11, 14. Plaintiff's attempt to minimize or negate this competent record evidence must be rejected. He ignores that these responsibilities and performance points are precisely the type of faith-based, religious tasks that the Supreme Court in *Our Lady of Guadalupe* deemed germane to apply the ministerial exemption for ostensibly lay employees like Plaintiff who performed religious job functions. 140 S. Ct. at 2066.

## ARGUMENTS ON REPLY

### A. *Our Lady of Guadalupe* Directs Courts to Consider Defendants' Job Expectations When Determining Ministerial Functions.

Plaintiff's response makes little mention of the prescribed analysis under *Our Lady of Guadalupe*, presumably because the factors the U.S. Supreme Court deemed significant conclusively favor Defendants[1]. For example, Plaintiff offers extensive criticism of Defendants' discussion of policies, mission statements, handbooks, etc. Pl.'s MOL, p. 16. By discounting the value of this undisputed record evidence, Plaintiff asks This Court to disregard the Supreme Court's precise directive that "[a] religious institution's explanation of the role of such employees in the life of the religion in question is important." 140 S. Ct. at 2066. When initiating its discussion of why plaintiffs in *Our Lady of Guadalupe* qualified for the ministerial exemption, the Supreme Court began the analysis by explicitly addressing the respective schools' missions, employment agreements, and faculty handbooks. *Id.,* at 2006. These considerations cannot simply be ignored even though Plaintiff would certainly like them to be. This Court must also evaluate the uncontroverted record evidence presented in Defendants' moving papers and consider that, in context with other factors, the Defendants expected that Plaintiff would provide ministerial, spiritual leadership. This includes but is not limited to the Policy and Procedure providing that "the

---

[1] Plaintiff seemingly adopts the rationale of the dissenting opinion of *Our Lady of Guadalupe*, *i.e.,* appealing to sympathy as a cancer survivor and former Marine, and he ignores that the majority in *Our Lady of Guadalupe* decided the case in the context of alleged discrimination after a medical leave and disability. This Court already recognized the need to focus only on the ministerial question as a threshold inquiry. Defendants deny "opening the door" regarding any specifics of his leave, medical condition, or ultimate termination when explaining why their moving brief omitted any explanation for denying the discrimination allegations in Plaintiffs' Amended Complaint. In short, Defendants never attempt to explain the ultimate rationale for termination because the holding in *Hosanna-Tabor Evangelical Lutheran Church & Sch. V. EEOC* clarified that such an inquiry is premature at this phase. 565 U.S. 171, 194 (2012). It is unclear why Plaintiff provided these details where the information lacks any nexus to the matter at hand: whether the record allows This Court to classify Plaintiff as ministerial for purposes of applying the exception. This Court should not be swayed by impermissible and irrelevant considerations in deciding Defendants' summary judgment motion.

3

principal has the majority responsibility for the religious education program of the school."(SUF at 11).[2]

### B. "Lay Employee" and "Ministerial" Are Not Mutually Exclusive per *Our Lady of Guadalupe*.

Plaintiff repeatedly mentions that he was a "lay principal" and received benefits for "lay" employees rather than clergy, once again ignoring the directive in *Our Lady of Guadalupe* on this precise topic. *See* Pl.'s MOL, p 7; Pl. SOF, Ex. K. In this regard, Plaintiff is indistinguishable from the plaintiffs in *Our Lady of Guadalupe,* where plaintiffs held the title of "lay" employees but were nevertheless deemed ministerial based on job functions. *Our Lady of Guadalupe* specifically states that titles constitute only one factor to consider and admonished against making titles "all-important." 140 S.Ct. at 2063. The holding confirms that the terms "lay" and "ministerial" are *not* mutually exclusively as Plaintiff argues.

### C. The Court Must Defer to Defendants' Qualification Criteria.

Plaintiff inaccurately claims that he cannot classify as ministerial because he lacks formal religious training. Pl.'s MOL, pp. 6-7. Per *Our Lady of Guadalupe*, what matters is not necessarily the formality of his religious training, but that Fr. Judge determined that he had adequate training and a "sufficient understanding of Catholicism" to lead their teachers, campus minister, administrators, and students as principal. *See* 140 S. Ct. at 2067; SUF at 48-51. The Supreme Court addressed this point specifically: "[t]he significance of formal training must be evaluated in light of the age of the students taught and the judgment of a religious institution regarding the need for formal training." *Id.* The Supreme Court recognized that the defendant schools "thought that

---

[2] Plaintiff introduces a document prepared by a third-party consultant who was *not* an employee of the AOP, OCE, or Fr. Judge. Pl.'s MOL, p. 6. Citing it, he attempts to argue that the absence of a ministerial function analysis somehow means that Mr. Chapla did not have such functions. That document is inadmissible hearsay and cannot be considered in deciding the summary judgment motion. Even if that were not the case, this argument lacks logical or evidentiary support; nothing in the record even suggests that Defendants tasked the consultant with evaluating Plaintiff on ministerial performance, nor is there any foundation to conclude she had the credentials or context to do so.

[plaintiffs] had a sufficient understanding of Catholicism to teach their students," and concluded that "judges have no warrant to second-guess that judgment or to impose their own credentialing requirements." *Id.* A contrary holding would impermissibly permit judges to substitute their own judgment for those of religious leaders running an undoubtedly religious institution.

Further, Plaintiff did have a Roman Catholic background. The record shows Plaintiff confirmed his status as a practicing Roman Catholic as a job prerequisite. (SUF at 51). Mr. Chapla also acknowledges fully participating in mass and attending a multitude of retreats for administrators, faculty, and students as principal. (SUF at 78, 125, 137, 140, 142). Mr. Chapla had no more or less material religious training than either plaintiff in *Our Lady of Guadalupe.* 140 St. Ct. at 1056-57. This Court must defer to Defendants' judgment regarding the adequacy of Plaintiff's religious training. That Plaintiff disagrees with Defendants' judgment has no probative value.

### D. Evaluating and Overseeing Religious Teaching and Ministry at Fr. Judge Are Ministerial Tasks.

To refute application of the ministerial exception, Plaintiff unavailingly argues that, because he did not directly teach a specific class on religion or function as campus minister, the exception cannot apply to him. Pl.'s MOL, p. 8. He claims that having direct teaching responsibilities somehow distinguishes the teachers at Fr. Judge from him, even though the uncontroverted evidence confirms that *he gave theology teachers Catholic-specific guidance, instruction, and feedback on the quality and efficacy of their religious instruction to the students*. (*See* SUF at 154[3]). Moreover, he adjudicated all faculty on "Catholic Identity" and *his*

---

[3] Plaintiff's theology department teacher performance reviews include the following excerpts by way of illustration: "X demonstrated excellent fidelity to the teachings of the Catholic Church during this theology lesson. She led the class in prayer with enthusiasm. Her classroom reflects the Catholic Identity of Father Judge and the traditions of St. Francis De Sales."; Plaintiff praised that a teacher "clearly impressed upon her students the importance of the Catholic education and embodied in them the greater awareness of living their faith each day during the school day."; Plaintiff focused on a Theology Departure teacher "ensuring students receive instruction in the traditions of St. Francis De

***perception of their performance relative to six (6) specific, religious-focused performance points*** regarding (i) prayer in class, (ii) promotion and participation in sacramental life, (iii) adherence to church teaching, (iv) building a community of faith through religious and spiritual programs, (v) witnessing Christian values, and (vi) participating in retreats and spiritual growth programs. (SUF at 153).

Plaintiff claims that his "supervision of the theology teacher[s] would be no different from the supervision of any other teacher in any said school," ignoring extensive evidence revealing that his reviews and guidance included the previously cited religious, Catholic-faith specific analysis. (SUF at 20, 21, 153, 154); Pl MOL, p. 8. There is no competent record support that Plaintiff provided comparable supervision as part of his "supervision of any other teacher in any school" at the public high schools where he previously worked. Pl.'s MOL, p. 8; (SUF at 47 (Ex. 18). This serves as yet another example of Plaintiff making a general denial that, when viewed against the actual record, defies logic and lacks evidentiary support.

Although never a direct classroom religious teacher, there's no dispute that Plaintiff both (i) had ultimate authority for the religious education provided within the classroom (SUF at 11) ("the principal has the majority responsibility for the religious education program of the school") and (ii) exercised that authority. (SUF at 13) (Plaintiff addressed Catholic identity, mission and beliefs for new teacher inductions); (SUF at 142-144) (Plaintiff emailed theology department teachers with suggestions to "think about improving how we do our programs to develop Salesian

---

Sales;" Plaintiff adjudicated a teacher on "Catholic Identity," noting his opinion that she had "effectively demonstrated" this criteria by "leading the class in prayer, offering special intentions and practicing the Catholic faith in a school setting;" Plaintiff praised that a class was "very much one of a Catholic Identity" and incorporated St. Thomas Aquinas into the opening prayer and lesson; he also praised discussion about "why we believe in God" and generally focus on participation in theological discussions;" Plaintiff praised a Deacon for inspiring students "to live the Salesian Gentleman life in words and in deeds;" Plaintiff noted a teacher's ability to prioritize prayer and the "important tenets of the catholic faith" and noted the individual's ability to "share[] knowledge and spirituality with his colleagues at every opportunity." (SUF at 154).

Gentlemen" and open discussion with him to "help our Salesian identity become more proactive, detailed and most of all collectively improved."); (SUF at 154) (Plaintiff provided detailed reviews of theology department teachers relative to Catholic and faith specific teachings); (SUF at 153) (six-factor faculty review on Catholic Identity). It is axiomatic that, when certain Roman Catholic school religious teachers are deemed ministerial, the individuals who undisputedly evaluate, guide, and adjudicate those ministerial performances also exercise some degree of ministerial duties of their own. *See Petruska v. Gannon Univ.*, 461 F.3d 294, 307 n. 10 (3d Cir. 2006) ("To the extent that [an employee] supervises spiritual functionaries, at least some of the functions he performs are, by definition, spiritual ones"); *see also* SUF at 155. Plaintiff admits that certain teachers and staff at Fr. Judge who supervised, directed, and evaluated have ministerial duties. It defies logic and common sense that he was not also acting in a ministerial function when leading and direting them as demonstrated specifically in the underlying case record. *See Petruska*, 461 F.3d at 307 n. 10.

  Plaintiff's opposition also ignores the uncontroverted record evidence that he directed the campus minister's *ministerial* performance. (SUF at 44, 100-105, 151, 152). Plaintiff would have This Court believe he merely checked boxes when the campus minister planned a retreat or conducted prayer. Pl.'s MOL, p. 5-6. The record, however, reveals that Plaintiff's oversight required *and included* Catholic-specific guidance and directives. (SUF at 44, 100-105, 151, 152). Although Plaintiff's Memorandum ignores his testimony, Plaintiff conceded that he had a duty to improve ministerial function by working with the Campus Ministry and Theology Departments, and he did so by engaging directly with the Campus Minister and aligning efforts with the AOP Office of Catechetical Formation. (SUF at 98, 146, 152). Indeed, Plaintiff admitted that he had an "obligation" to improve theology department instruction, class retreats, and faculty retreats as

principal. (SUF at 146). He even testified that he "educate[d]" himself to do so by attending the OCE sponsored retreat, speaking with retreat presenter, and speaking with the president of a Salesian university. *Id.*

The record confirms that Plaintiff, as principal, engaged in the very same religious practices that have led courts to conclude that some religious schoolteachers are "ministerial" employees. As outlined in the preliminary statement herein, Plaintiff undisputedly led prayer (SUF at 74, 75, 78, 82-87, 116, 117, 126, 127, 133), gave blessings at meals (SUF at 88), promoted prayer, mass and/or retreat attendance (SUF at 78, 80, 132, 137), participated in school masses (SUF 59. 78, 156-158), and generally promoted the virtues of St. Francis de Sales, *i.e.,* creating "Salesian Gentlemen." (SUF at 65-68; 101-105, 108, 111-115). *See* Def. MOL, pp. 29-30. Indeed, "in the context of the ministerial exception, there is no principled distinction to be drawn between teachers and principals." *Orr v. Christian Bros. High Sch.*, 2021 U.S. App. LEXIS 34810, at *2-3 (9th Cir. Nov. 23, 2021), *cert. denied*, 143 S. Ct. 91 (2022). The record here does not support any such distinction based on the nuanced, factual record and analysis before This Court.

### E. Mr. Chapla Promoted Faith Formation Through His Active, Public Participation at Fr. Judge Masses, Ceremonies, and Retreats

In an effort to undermine its significance, Mr. Chapla characterizes his role and participation at *his own Installation Mass* as merely "attendee." Pl.'s MOL, p. 18. He even attempts to diminish the mass' importance by referring to it as a "single ceremony on one occasion." *Id.* In this, he discloses an apparently new disregard for his role as the *inspiration and focus of the mass*, and attempts to downplay the importance of his participation as a *speaker at the mass*, during which he publicly *pledged* to lead, guide and administer "with the authority of the OCE and Oblates of St. Francis de Sales," and *promised* to seek the intersession of St. Francis and the prayers of the school when performing his role as principal "in a manner most pleasing to

8

God." SUF at 59. No doubt, Mr. Chapla now seeks to discount the significance of his pledge and promise before clergy of his own faith and the Fr. Judge community because it elucidates that his role required him to meld religious and academic functions. The *pledge* and *promise* that he publicly recited reveals that he both *acknowledged and performed* his Catholic-specific job function by praying to and with the school community. *Id.* As evidenced by the record, he continued to pray to and with the community throughout his tenure as principal. (SUF at 67, 74, 75, 78, 80, 82-88).

Regarding the Ring Mass, Plaintiff now claims it was his role to "shake students' hands" and "give them a ring" during the ceremony, however the undisputed scripted program for the ritual demonstrates that Fr. Judge expected attendees to approach the ritual with solemnity and faith relating specifically to the rings that Plaintiff distributed. (SUF at 156-158). Mr. King certainly thought that the case as explained through his testimony. (SUF at 157). Any reasonable observer would conclude that Plaintiff - by standing at the alter and participating in the Induction Mass and Ring Mass through both word and action – played an active and significant role in conducting these religious ceremonies. (SUF at 157). Again, Plaintiff ignores the Supreme Court's explanation that the ministerial exemption applies to an employee who "conducts worship services *or* important religious ceremonies or rituals, *or* serves as a messenger or teacher of its faith." 140 S. Ct. at 2064 (emphasis added).

### F. Plaintiff Ignores Analogous Caselaw and Relies on Wholly Distinguishable Cases

Rather than confront the record evidence regarding Plaintiff's actual job performance as principal, or the cited caselaw with comparable fact patterns and procedural histories, Plaintiff focuses on caselaw that predates the *Our Lady of Guadalupe* opinion and/or involves employees wholly distinctive from Plaintiff relative to job duties such as custodians, administrative assistants, customer services representatives, social work professors, etc. Pl.'s MOL, pp. 5-6; 10-12. He never

9

attempts to distinguish cited caselaw finding that religious school principals were ministerial, presumably because he cannot find much (if any) factual distinction. Instead, as an example, he devotes considerable attention to the distinguishable holding in *Trotter v. United Lutheran Seminary,* 2021 U.S. Dist. LEXIS 14222 (E.D. Pa. July 30, 2021). That case is inapposite because there are material distinctions between his own job duties and those of the plaintiff in *Trotter*.

This Court in *Trotter* declined to grant summary judgment to the defendant because it concluded from the record that plaintiff (i) did not have ministerial tasks within her written job functions, (ii) did not lead prayer, and (iii) did not teach religion at the seminary. *Id.* at *10-13. By contrast, Mr. Chapla explicitly had *primary* responsibility for religious education at Fr. Judge along with several other previously addressed religious duties. (SUF at 11); *see also* (SUF at 12-16 (OCE religious requirements for administrators); (SUF at 40-41)(job posting re: "Catholic Identity"), (SUF at 44-45)(job description in school handbook). Mr. Chapla undisputedly *did* lead prayers on countless occasions, both verbally and in writing. (SUF at 74, 75, 78, 82, 83-87). He not only had direct responsibility for the teachers who gave student instruction, but he also *directed and adjudicated the Theology Department and the Campus Minister's job performance specifically on religious topics.* (SUF at 152-154). This is beyond dispute; Plaintiff clearly did more than merely "oversee" the work of other ministerial employees, as did the plaintiff in *Trotter*. 2021 U.S. Dist. LEXIS 14222, at *10-13. It was also incumbent upon Plaintiff to promote and advance the Roman Catholic mission of the school, and the undisputed record evidences that he did just that.

Plaintiff's reliance on *DeWeese-Boyd v. Gordan Coll.* is also misplaced because, as in *Trotter*, the plaintiff there had markedly distinctive job duties.163 N.E.3d 1000 (Mass. 2022) The plaintiff in *DeWeese-Boyd,* a social work professor, did not lead prayer or attend religious services

or events with students. To the extent she integrated Christian faith in her performance, the record showed that it did not involve the promotion of a specific religious doctrine. *Id.* at 1014. That and the other cases upon which Plaintiff relies can be distinguished on these factors alone, leaving aside the multitude of the aforementioned Salesian, Roman Catholic, or otherwise faith-based activities performed by Plaintiff but not by the plaintiff in *DeWeese-Boyd.*

      Finally, there is no merit to Plaintiff's contention that summary judgment is inappropriate in this case because the ministerial exception's applicability is fact-intensive. [4] Plaintiff has not cited a single case holding there is a carve-out from well-settled summary judgment principles for the ministerial exception. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986) (the ultimate inquiry on a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."). Thus, there is no impediment to granting summary judgment here. That is particularly so since the competent record evidence forecloses any argument or doubt as to Plaintiff's ministerial job duties and related performance. The record is most analogous to the cases cited in Defendants' Memorandum of Law, where summary judgment was awarded because the

---

[4] Plaintiff's reliance on *Bell v. Judge Mem'l Catholic High School*, 2023 U.S. Dist. LEXIS 90351 (D. Utah May 22, 2023) is misplaced. The court there noted that, unlike in this case, the underlying record did not include specifics as to job performance but focused only on written job duties. Per the opinion, plaintiff never attended faith-based workshops or meetings, only once accompanied students to mass, and was not a practicing Catholic. The court therefore concluded that it did not have the information needed to summarily conclude if the ministerial exemption applied and denied summary judgment (significantly, without articulating a *per se* rule that the question of whether the ministerial exception applies cannot be decided on summary judgment). Here, however, the record is replete with the key information necessary to make a summary judgment determination under *Our Lady of Guadalupe*. Further, Plaintiff ignores that most civil lawsuits involve some level of factual disagreement but Rule 56 nevertheless allows the Court to dismiss where, as here, the party opposing relies only on bare assertions, conclusory allegations, general denials, conclusions or suspicion to show the existence of a genuine issue. *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) ; *see also Anderson*, 477 U.S. at 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.") (emphasis in original). This case is indistinguishable from *Our Lady of Guadalupe* and its progeny, therefore, and is ripe for summary judgment.

underlying records contained ample information relative not only regarding Defendants' written policies and job expectations, but also the job functions the employee actually performed. Def. MOL, pp. 18-19, 28-31.

## **CONCLUSION**

For all these reasons, Defendants respectfully requests that this Court enter an Order pursuant to Fed. R. Civ. P. 56 dismissing Plaintiff's Amended Complaint with prejudice.

Respectfully submitted,

**JACKSON LEWIS P.C.**

*/s/ Eileen K. Keefe*
Eileen K. Keefe
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102
T: (267) 319-7802
F: (215) 399-2249
Eileen.Keefe@jacksonlewis.com

ATTORNEY FOR DEFENDANTS

Date: February 23. 2024

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing **DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56** to be served upon the following counsel of record, via ECF this 23rd day of February, 2024.

Adam C. Lease, Esquire
Karpf, Karpf & Cerutti, P.C.
3331 Street Road
Two Greenwood Square, Ste. 128
Bensalem, PA 19020

**JACKSON LEWIS P.C.**

*/s/ Eileen K. Keefe*
Eileen K. Keefe

4889-9244-3816, v. 5