IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PETER CHAPLA,** | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| **FATHER JUDGE HIGH SCHOOL, et al.,** | : | NO. 2:22-cv-3971-MRP |
| Defendants. | : | |

Perez, J.                                                                                January 29, 2025

**MEMORANDUM**

Plaintiff Peter Chapla brings this action against Father Judge High School ("Father Judge"), the Archdiocese of Philadelphia, and the Office of Catholic Education, alleging they illegally terminated him in violation of the Americans with Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), the Age Discrimination in Employment Act ("ADEA"), the Pennsylvania Human Relations Act ("PHRA"), and the Philadelphia Fair Practices Ordinance ("PFPO"). Defendants move for summary judgment on the grounds that the ministerial exception precludes Plaintiff's claims. For the reasons set forth below, the Court agrees. Defendants' motion for summary judgment is therefore granted.

**I. BACKGROUND**

From June 2018 to June 2022, Plaintiff served as the principal of Father Judge, a Roman Catholic school operated by the Office of Catholic Education and the Archdiocese of Philadelphia. ECF No. 32-3 at ¶¶ 1-6. Schools within the Office of Catholic Education system, like Father Judge, focus on "developing young adults through Catholic value based education." *Id.* at ¶ 6. In 2018, Father Judge posted a job opening for the principal position. The posting included a list of "primary responsibilities," the first of which was labeled "Catholic Identity." ECF No. 32-17. This

responsibility included "[p]romot[ing] the essential characteristics and fundamental values of a Catholic school," in addition to "[a]dvanc[ing] a spirit conducive to prayer, study, and an ongoing commitment to Christ-like behavior . . . ." *Id.* The remaining primary responsibilities ranged from leadership to student affairs and instructional assistance. *Id.*

Plaintiff applied for the position and received a job offer on April 17, 2018, which was contingent on receipt of a letter from his pastor confirming his registration as an active parishioner at a Roman Catholic parish. ECF No. 32-3 at ¶ 50. Plaintiff obtained the required letter and accepted the position. *See id.* at ¶ 51. On September 28, 2018, Father Judge held an Induction Mass to welcome and formally install Plaintiff as the school's new principal. ECF No. 32-27. During the ceremony, Plaintiff "pledge[d] to lead, guide and administer [the] school with the authority given to [him] by the Office of Catholic Education and the moral authority handed down by the Oblates of St. Francis de Sales." *Id.*

As principal of Father Judge, Plaintiff had "major responsibility for the religious education program of the school." ECF No. 32-6 at 9. Plaintiff testified that he "attended every single mass that was scheduled," participated in most of the religious retreats, and oversaw campus ministry. ECF No. 32-3 at ¶¶ 78, 151. Plaintiff's performance as a "Catholic Witness" was evaluated, and he assessed all faculty, including members of the theology department, on the same criterion. *Id.* at ¶¶ 72, 153. In February 2022, Plaintiff proposed a half-day "faculty retreat focused on Salesian spirituality." *Id.* at ¶ 139; ECF 32-46. Plaintiff suggested the retreat consist of mass and breakout sessions on "topic[s] important to Salesian Virtues." *Id.* Following religious retreats, Plaintiff proposed ways to improve the school's programming with respect to developing the Salesian identity. *Id.* at ¶¶ 142-44.

Plaintiff served as a Eucharistic minister on one occasion to distribute the body of Christ. *Id.* at ¶ 79. Plaintiff also participated in Ring Mass by welcoming families and distributing rings newly blessed by the presiding priest. *Id.* at ¶ 80. On another occasion, Plaintiff shared a personal account of his faith with students and faculty. *Id.* at ¶ 76. Plaintiff led prayer at faculty meetings and would send prayerful messages to the school community. *Id.* at ¶¶ 83-84, 131; ECF No. 32-12 at 127. When asked about Plaintiff's ministerial duties, Father Judge President Brian King explained that Plaintiff "was responsible for the deployment, right, of the mission, living the mission, being a part of [the] mission day in day out . . . ." ECF No. 32-19 at 23:17-23. Further, Father Joseph Campellone, an Oblate priest at Father Judge and former chaplain, described Plaintiff "as a pastor of the school" and "the overseer of the catholic culture of the school." ECF No. 32-32 at 12:17-18, 17:6-7. Father Campellone added, "Pete was able to keep a really good culture of what our spirituality was about." *Id.* at 12:11-13.

On June 2, 2022, Plaintiff was terminated. ECF No. 18 at ¶ 31. Plaintiff alleges the termination was abrupt and "due to his advanced age and health conditions/needs." *Id.* at ¶ 39. As a result, Plaintiff filed the operative complaint, alleging violations of the ADA, FMLA, ADEA, PHRA, and PFPO. *Id.* Defendants filed an answer, asserting the ministerial exception as an affirmative defense. ECF No. 19. Thereafter, the Court granted Defendants' motion to conduct limited discovery on the application of the ministerial exception. ECF No. 20. Now, Defendants move for summary judgment, arguing that the ministerial exception bars Plaintiff's claims as a matter of law. Plaintiff responds that the ministerial exception is inapplicable to this case because his position was administrative, rather than religious, in nature.

II.     **LEGAL STANDARD**

Summary judgment is properly granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Facts are material if they "might affect the outcome of the suit under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc., et al.*, 954 F.3d 615, 618 (3d Cir. 2020). A dispute as to those facts "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In assessing a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

### III.    DISCUSSION

"The First Amendment protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 736 (2020) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)). To "ensure[] that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—is the church's alone," the ministerial exception was born. *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 194-95 (2012) (quoting *Kedroff*, 344 U.S. at 119)). Under the ministerial exception, "courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Our Lady of Guadalupe*, 591 U.S. at 746.

When evaluating whether the ministerial exception applies, courts must "take all relevant circumstances into account and . . . determine whether each particular position implicated the fundamental purpose of the exception." *Id.* at 758. "When a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow." *Id.* at 762. Thus, in the religious school context, the ministerial exception "should apply to any employee who leads a religious organization,

conducts worship services or important religious ceremonies or rituals, or serves as a messenger or teacher of its faith." *Id.* at 751 (internal quotations omitted).

The Supreme Court has consistently declined to adopt "a rigid formula" for determining whether the exception applies. *Id.* at 758. Notwithstanding this, the Court has acknowledged several circumstances that may be important. In *Hosanna-Tabor*, the Court considered the plaintiff's job title, whether the position "reflected a significant degree of religious training," whether the plaintiff "held herself out as a minister of the Church," and whether the plaintiff's "job duties reflected a role in conveying the Church's message and carrying out its mission." 565 U.S. at 191-92. In *Our Lady of Guadalupe*, the Court identified these factors as "relevant" but not "essential," emphasizing that "the significance of those factors in [*Hosanna-Tabor*] did not mean that they must be met—or even that they are necessarily important—in other cases." 591 U.S. at 751-52. Indeed, the *Our Lady of Guadalupe* Court also considered the school's stated mission, the employment agreements and faculty handbook, the plaintiff's participation in prayer, and whether the plaintiff performed important religious duties. *Id.* at 756-57. The Court has made clear "[w]hat matters, at bottom, is what an employee does." *Id.* at 753.

As in *Our Lady of Guadalupe*, "[e]ducating and forming students in the Catholic faith lay at the core of" Father Judge's mission. *Id.* at 757. Secondary schools under the Office of Catholic Education umbrella, including Father Judge, undoubtedly focus on "developing young adults through Catholic value based education." ECF No. 32-4 at 6. As principal of Father Judge, Plaintiff had "major responsibility for the religious education program of the school." ECF No. 32-6 at 9. Plaintiff oversaw school ministry, attended every mass, shared a personal account of his faith with students and staff, led prayer at faculty meetings, served as a Eucharistic minister on one occasion, proposed religious retreat sessions on topics important to Salesian virtues, and proposed ways to

improve teachings to emphasize Salesian identity. *See* ECF No. 32-12; ECF No. 32-19; *see also Orr v. Christian Brothers High Sch., Inc.*, No. 21-15109, 2021 WL 5493416, at *1 (9th Cir. Nov. 23, 2021) (applying the exception where the plaintiff "participated in religious services and activities" and "had supervisory authority over aspects of religious instruction and programming."). Plaintiff's performance as a "Catholic Witness" was assessed as part of his performance evaluation, ECF No. 32-7, and during his induction mass, Plaintiff pledged "to lead, guide and administer [the] school with the authority given to [him] by the Office of Catholic Education and the moral authority handed down by the Oblates of St. Francis de Sales." ECF No. 32-27. In addition to the foregoing, the record is replete with examples showing Plaintiff's key "role in conveying the Church's message and carrying out its mission." *Hosanna-Tabor*, 565 U.S. at 192; *see, e.g.,* ECF No. 32-7 (Plaintiff's performance evaluation noting that he "provided a consistent example of what it means to carry oneself as a Salesian Gentleman."); ECF No. 32-52 (Plaintiff's evaluation of a teacher in the theology department, noting they "demonstrated excellent fidelity to the teachings of the Catholic Church.").

Importantly, Defendants considered Plaintiff a key religious leader of the school. *See Our Lady of Guadalupe*, 591 U.S. at 757 ("A religious institution's explanation of the role of such employees in the life of the religion in question is important."). When asked about Plaintiff's ministerial duties, Father Judge President Brian King explained that Plaintiff "was responsible for the deployment, right, of the mission, living the mission, being a part of [the] mission day in day out, . . . ." ECF No. 32-19 at 23:17-23. Moreover, Father Joseph Campellone, an Oblate priest at Father Judge and former chaplain, described Plaintiff "as a pastor of the school" and "the overseer of the catholic culture of the school." ECF No. 32-32 at 12:17-18, 17:6-7. Father Campellone

added, "Pete was able to keep a really good culture of what our spirituality was about." *Id.* at 12:11-13.

Plaintiff's administrative duties do not obviate his ministerial ones such that he is ineligible for the ministerial exception. As the Third Circuit has noted, "[t]o the extent [an employee] supervises spiritual functionaries, at least some of the functions he performs are, by definition, spiritual ones." *Petruska v. Gannon Univ.*, 462 F.3d 294, 307 n.10 (3d Cir. 2006). Similarly, Plaintiff's title as "principal" does not diminish the ministerial nature of his job. In fact, courts routinely apply the ministerial exception to lay employees. *See, e.g., Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529, 534 (7th Cir. 2023) (applying the exception to a guidance counselor); *Orr*, 2021 WL 5493416, at *1 (applying the exception to a principal).

Based on the foregoing, this Court joins the others that have held the ministerial exception applies to a principal who performed important religious functions for the school. As such, the ministerial exception applies to Plaintiff.

### IV. CONCLUSION

The record before the Court establishes that the ministerial exception bars Plaintiff's ADA, FMLA, ADEA, PHRA, and PFPO claims. The Court therefore grants Defendants' motion for summary judgment. An appropriate order follows.